# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| GEA SYSTEMS NORTH AMERICA LLC, | ) ) ) | |
| Plaintiff/Counterclaim Defendant, | ) ) ) | |
| v. | ) ) | |
| GOLDEN STATE FOODS CORP., | ) ) ) | C.A. No. N18C-11-242 EMD CCLD |
| Defendant/ Counterclaim/ Third-Party Plaintiff, | ) ) ) | |
| v. | ) ) | |
| ALLIANZ GLOBAL RISKS U.S. INSURANCE COMPANY, | ) ) ) | |
| Third-Party Defendant. | ) ) ) ) | |

Submitted: January 24, 2020
Decided: June 8, 2020

*Upon Plaintiff and Counterclaim Defendant GEA Systems North America LLC's Motion for Partial Dismissal of Counterclaims*
***GRANTED, in part, and DENIED, in part***

David E. Ross, Esquire, Bradley R. Aronstam, Esquire, R. Garrett Rice, Esquire, Ross Aronstam & Moritz LLP, Wilmington, Delaware, and E. Hutchinson Robbins, Jr., Esquire, Megan B. Burnett, Esquire, Miles & Stockbridge P.C., Baltimore, Maryland. *Attorneys for Plaintiff GEA Systems North America LLC*

Patricia L. Enerio, Esquire, Gillian L. Andrews, Esquire, Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, and Randy K. Jones, Esquire, Anne-Marie Dao, Esquire, Mintz Levin Cohn Ferris Glovsky and Popeo, P.C., San Diego, California. *Attorneys for Defendant Golden State Foods Corp.*

Brian M. Rostocki, Esquire, Benjamin Chapple, Esquire, Justin M. Forcier, Esquire, Reed Smith LLP, Wilmington, Delaware. *Attorneys for Third-Party Defendant Allianz Global Risks U.S. Insurance Company*

**DAVIS, J.**

## I.   INTRODUCTION

This commercial dispute is assigned to the Complex Commercial Litigation Division of the Court.  On November 29, 2018, Plaintiff and Counterclaim Defendant GEA Systems North America LLC ("GEA") brought this action against Defendant and Counterclaim Plaintiff, Golden State Food Corp.  ("Golden State").  GEA contends that Golden State failed to pay the full contract price for three spiral freezers GEA sold to Golden State.  Golden State was to use the spiral freezers in its hamburger patty production facility located in Opelika, Alabama.  On September 16, 2019, Golden State filed an amended answer asserting counterclaims (the "Counterclaims") against GEA and a third-party claim against Allianz Global Risks U.S. Insurance Company ("Allianz").

On October 7, 2019, GEA filed Plaintiff and Counterclaim Defendant GEA Systems North America LLC's Motion for Partial Dismissal of Counterclaims ("the Motion").  In response, Golden State filed its Golden State Foods Corp.'s Answering Brief in Opposition to GEA Systems North America LLC's Motion for Partial Dismissal of Counterclaims (the "Response") on November 6, 2019.  GEA completed the briefing with its Plaintiff and Counterclaim Defendant's Reply Brief in Support of Motion for Partial Dismissal of Counterclaims (the "Reply").  The Court held a hearing on the Motion, the Response and the Reply on January 21, 2020.  The Court then took the Motion under advisement.

For the reasons set forth below, the Court **DENIES IN PART AND GRANTS IN PART** the Motion.

## II.     BACKGROUND[1]

GEA manufactures industrial freezers that can be used to freeze food products.[2]  Golden State produces meat and other food products to the foodservice industry.[3]  In or around September 22, 2016, Golden State purchased three GEA A-TEC 30CC-2x17-112 Twin Belt spiral freezers (the "Freezers") to be used to freeze hamburger patties.[4]  GEA was responsible for delivering and installing/starting up the Freezers in Golden State's Opelika, Alabama facility.[5] The price of the Freezers was $3,715,000.00.[6]

GEA sales representative Eric Johnston visited a Golden State facility located in Georgia "on several occasions to understand [Golden State's] operations and production needs for its new Opelika, Alabama facility."[7]  During meetings with Golden State, Mr. Johnston represented to Golden State "on several occasions prior to entering a written agreement that GEA's spiral freezers would meet the throughput, temperature, and production needs that Golden State required."[8]

The parties entered into a written agreement for the purchase and sale of the Freezers "[i]n or around July 2016."[9]  Golden State alleges that the written agreement is comprised of the following four documents: (1) the AIA Document A141 Agreement with exhibits (the "AIA Agreement"); (2) the August 2, 2016 Project Proposal Number U121023, Rev. Q (the

---

[1] Unless otherwise indicated, the following are the facts as alleged in the Counterclaims. For purposes of the Motion, the Court must view all well-pleaded facts alleged in the Counterclaims as true and in a light most favorable to the Plaintiffs. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[2] Def. Golden State Food Corp.'s Am. Ans. to Compl., Counterclaims, and Third-Party Claims (hereinafter "Counterclaim") ¶¶ 2, 6.
[3] *Id.* ¶ 3.
[4] *Id.* ¶ 8.
[5] *Id.* ¶ 11.
[6] *Id.* ¶ 10.
[7] *Id.* ¶ 9.
[8] *Id.*
[9] *Id.* ¶ 12.

3

"Proposal"); (3) the Preferred Vendor Master Supply and Services Agreement (the "MSSA"); and (4) the GEA Process Engineering, Inc. Standard Freezer Conditions of Sale (the "GEA Standard Freezer Conditions of Sale") (collectively, the "Contract").[10]

In August 2017, GEA represented that the installation of the Freezers was purportedly complete, and that Golden State could start production.[11] However, the Freezers allegedly had a variety of issues that prevented Golden State's production including failing parts, delayed production times, and incorrect installation.[12] Specifically, the Freezers' motor and gearboxes failed and were improperly installed; the coils had no frost abatement system, causing frost build-up and air balance issues; and the lower access doors were installed on the wrong side of the Freezers.[13] GEA represented that it would remedy the defects in the Freezers.[14] GEA supposedly left the issues unresolved.[15]

On October 13, 2017, Golden State informed GEA—by email to one of GEA's project managers and engineers, Dmitry Khokhlov and GEA Vice President Karl Parkinson—that GEA's previous repair attempts had failed and that, as a result, hamburger patties were "flying around like popcorn." In response, Mr. Khokhlov stated "I agree with you that it needs to be addressed."[16]

Although GEA sent an engineer to the Opelika facility, GEA failed to fix the Freezers.[17] On October 19, 2017, Golden State contacted GEA again to complain of its reduced production output due to "patties being blown around, motors going out on a regular basis, sensors failing on

---

[10] Plf. and Counterclaim Def.'s Br. in Supp. of Mot. for Partial Dismissal of Counterclaims at 3.
[11] Counterclaims ¶ 16.
[12] *Id.* ¶ 17.
[13] *Id.* ¶ 17.
[14] *Id.* ¶¶ 18-19.
[15] *Id.*
[16] *Id.* ¶ 18.
[17] *Id.*

a regular basis" and issues with maintaining freezer temperature.[18]  On December 1, 2017, Golden State contacted GEA by email to Messrs. Khoklov and Parkinson about the failure of four gear boxes due to water damage stemming from what Golden State believed to be faulty product design and installation.[19]  This gear box failure severely restricted patty production, and Golden State had to contact GEA again on December 11, 2017 to ask when gear box failures and other failures would be addressed.

From February 9, 2018 to February 12, 2018 Golden State shut down its production to allow GEA to implement a modification to correct air balance issues.[20]  Although GEA made written commitments to have the appropriate team on hand to start after the modifications, start-up was delayed on February 13, 2018 because the only GEA personnel on site stated that they lacked the expertise to deal with the issues that were present.  GEA had promised to have a commissioning engineer at the facility from February 13, 2018 to February 15, 2018.[21]  This engineer did not arrive on February 13, 2018, and GEA did not notify or explain its change in plans to Golden State.[22]  On February 22, 2018, Golden State contacted GEA with a laundry list of issues requiring GEA's attention, including its inability to run the Freezers for a full production day.[23]  On March 9, 2018, Mr. Parkinson responded with a promise to schedule a meeting with the GEA team for the following week.[24]

Based on GEA's allegedly fraudulent assurances, Golden State continued making progress payments to GEA yet was unable to fulfill substantial supply contracts due to the

---

[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*

5

Freezers' malfunctions.[25]  To date, GEA has not made the defective Freezers capable of running a full 17-hour production shift nor fully addressed its malfunctions.[26]

On November 15, 2018, Golden State sent a demand letter to GEA, threatening litigation and outlining its anticipated claims based on GEA's: (i) failure to supply Freezers that meet pounds-per-hour production figures that GEA promised; and (ii) failure to properly install or repair the Freezers.  In response, on November 29, 2018, GEA initiated this action, claiming breach of contract and declaratory judgment seeking "[a] declaration by the Court of the parties' rights status and legal relations with respect to the Contract and the parties' conduct arising from the purchase of the Freezers . . . ."[27]

On September 16, 2019, Golden State filed the Counterclaims against GEA.[28]  The Counterclaims assert causes of action for (i) Breach of Written Contract (Count I); (ii) Breach of Implied-in-Fact Contract (Count II); (iii) Breach of the Covenant of Good Faith and Fair Dealing (Count III); (iv) Negligence (Count IV); (v) Gross Negligence (Count V); (vi) Fraud – Fraudulent Inducement (Count VI); (vii) Fraud – Intentional Misrepresentation/Suppression (Count VII); (viii) Fraud – Negligent Misrepresentation/Suppression (Count VIII); (ix) Breach of Express Warranty (Count IX); (x) Unjust Enrichment (Count X); and (xi) Indemnification (Count XI).  GEA filed the Motion seeking relief under Superior Court Civil Rule 12(b)(6). The Motion contends that Counts II-VIII and X-XI should be dismissed.  Count I and Count IX are not the subject of this Motion.

---

[25] *Id.* ¶¶ 21, 24.
[26] *Id.* ¶ 20.
[27] *Id.* ¶ 25.
[28] Golden State also asserted a third party claim against Allianz.

At the January 21, 2020 hearing, the Court denied the Motion as to Count II and granted the Motion as to Count III. The Court set out the reason for these rulings on the record. The remainder of the Motion was taken under advisement by the Court.

### III. PARTIES' CONTENTIONS

#### A. GEA'S CONTENTIONS

In the Motion, GEA presents a number of arguments. GEA first contends that this Court should apply Delaware law rather than Alabama law. Second, GEA alleges that the economic loss doctrine bars the claims for Negligence (Count IV) and Gross Negligence (Count V). Third, as to Golden State's claim for Gross Negligence (Count V), GEA contends that Golden State fails to provide facts supporting an extreme departure from the standard of care. Fourth, GEA contends that Golden State fails to state a claim for Fraudulent Inducement (Count VI). Fifth, GEA asserts that the claims for Intentional Misrepresentation/Suppression (Count VII) and Negligent Misrepresentation/Suppression (Count VIII) are duplicative of the claim for Breach of Contract (Count I). Sixth, GEA contends that the claim for Unjust Enrichment (Count X) fails to state a claim because there is a governing contract. Seventh, GEA contends Golden State has failed to state a claim for Indemnification (Count XI) because Golden State has not stated with sufficient detail the harm it has suffered. Finally, GEA contends that the request for punitive damages should be dismissed.

#### B. GOLDEN STATE'S CONTENTIONS

In response, Golden State first argues that Alabama law should apply under the "most significant relationship" test. Second, Golden State argues that it has stated a claim for all counts and has alleged the specific time, place, and contents of the false representations by GEA sufficient to meet the heightened pleading standard under Rule 9(b). Golden State contends that

7

its contractual and tortious causes of action are adequately pled, as these arise from independent duties of law and contract and thus are not duplicative or barred by the economic loss doctrine. Lastly, Golden State argues that it properly asserted a claim for punitive damages.

## IV.    STANDARD OF REVIEW

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[29]  However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[30]

## V.    DISCUSSION

### A. A CHOICE OF LAW ANALYSIS IS UNNECESSARY.

The parties dispute whether Alabama law or Delaware law applies to all of Golden State's claims.  Golden States alleges that the Contract comprises four different written documents, three of which contain choice of law provisions.  Golden States argues that the AIA Agreement should control and the Court should apply Alabama law.  GEA counters, contending that the GEA Standard Freezer Conditions of Sale should control and the Court should apply Delaware law.  The GEA Standard Freezer Conditions of Sale is the only document signed by both parties and dated.[31]  GEA argues that the AIA Agreement and the MSSA were not actually agreed to by the parties because these agreements were not signed and appear to be in draft form.

---

[29] *See Central Mortg. Co.*, 227 A.3d at 536 (Del. 2011); *Cedars Academy*, 2010 WL 5825343, at *3.
[30] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).
[31] Counterclaims at ¶ 13; Ex. 1, at 66.

8

The MSSA provides "[a]ll disputes involving the subject matter of this MSSA, except actions arising under the patent and copyright provisions of the U.S. Code, shall be determined under the law of the State of Delaware…"[32] The GEA Standard Freezer Conditions of Sale provides "[p]roposals and/or resulting contracts shall be interpreted solely under the laws of the state of Delaware, USA and the United Nations Convention on Contracts for the International Sale of Goods shall not apply."[33]  Furthermore, GEA contends the Proposal incorporates the GEA Standard Freezer Conditions of Sale and its Choice of Law.[34]  The AIA Agreement provides "[t]he Design-Build Contract shall be governed by the law of the place where the Project is located."[35]  The Project is located in Opelika, Alabama.[36]

Under Delaware law, the first step in a choice of law analysis is to ask whether the parties made an effective choice of law in their contract.[37]  "Delaware courts will generally honor a contractually designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction."[38]  Even if there is an effective choice of law provision and the jurisdiction selected has some material relationship to the transaction, Delaware courts have declined to decide whether a particular jurisdiction's law applies if there is a "false conflict."[39]  A "false conflict" means that there is no material difference between the laws of

---

[32] Counterclaims, Ex. 1, at 60, MSSA § 11.
[33] Counterclaims, Ex. 1, at 61, GEA Standard Freezer Conditions of Sale § 1.
[34] Counterclaims, Ex. 1, at 44, Project Proposal Number U121023 § C. ("Detailed terms as per enclosed GEA RNA Standard Terms & Conditions").
[35] Counterclaims, Ex. 1, at 38, AIA Agreement § A.13.1.1.
[36] Counterclaims ¶ 9.
[37] *Certain Underwriters at Lloyds, London v. Chemtura Corp.*, 160 A.3d 457, 464 (Del. 2017) (citations omitted) ("Delaware follows the Second Restatement's "most significant relationship" analysis when considering choice of law in contract disputes. There are, in essence, three components to this choice-of-law analysis: i) determining if the parties made an effective choice of law through their contract; ii) if not, determining if there is an actual conflict between the laws of the different states each party urges should apply; and iii) if so, analyzing which state has the most significant relationship.").
[38] *J.S. Alberici Const. Co., Inc. v. Mid-W. Conveyor Co., Inc.*, 750 A.2d 518, 520 (Del. 2000).
[39] *See In re Bay Hills Emerging Partners I, L.P.,* 2018 WL 3217650, at *5 (Del. Ch. July 2, 2018), *appeal refused*, 2018 WL 3545305 (Del. Ch. July 23, 2018), and *appeal refused sub nom. BHEP GP I, LLC v. Kentucky Ret. Sys.,*

9

competing jurisdiction, in which case the court should avoid the choice of law analysis altogether.[40]

The parties spend time in their briefing arguing over which of the agreements should control. Both parties rely upon *SIGA Technologies Inc., v. PharmAthene, Inc.*[41] In *SIGA*, the Supreme Court analyzed two separate contracts containing competing choice of law provisions.[42] The Supreme Court found that the merger agreement should control because it was signed later in time and it also envisioned a broader scope of the parties' relationship.[43] The circumstances here do not present the same conflict. Even where there are competing choice of law provisions in different contracts governing the parties' relationship, the court is not required to conduct a choice of law analysis where there does not appear to be a conflict of law.[44]

In *In re Bay Hills Emerging Partners I, L.P*, the parties agreed that Kentucky law applied to the limited partnership agreement under the choice of law provision.[45] Although the Court of Chancery found that Kentucky had a material relationship to the parties' dispute, it decided that a choice of law analysis was unnecessary where there was no meaningful conflict of laws.[46] It declined to decide whether Delaware or Kentucky law should apply.[47]

In *Standard General L.P. v. Charney*, the contract at dispute was composed of multiple agreements with conflicting choice-of-law provisions: three of the agreements contained

---

191 A.3d 292 (Del. 2018); *Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *9 (Del. Ch. Dec. 19, 2017), *judgment entered*, (Del. Ch. 2018), *and aff'd*, 195 A.3d 16 (Del. 2018).
[40] *Deuley v. DynCorp Int'l, Inc.*, 8 A.3d 1156, 1161 (Del. 2010).
[41] *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330 (Del. 2013).
[42] *Id.* at 342.
[43] *Id.* at 343.
[44] *See GreenStar IH Rep, LLC v. Tutor Perini Corp.*, at *4 (Del. Ch. Feb. 23, 2017) (citing *Deuley*, 8 A.3d at 1161) (declining to decide which law should apply where the employment agreement was governed by New York law and the Merger Agreement was governed by Delaware law because there did not appear to be a conflict).
[45] *In re Bay Hills Emerging Partners I, L.P.,* 2018 WL 3217650, at * 4.
[46] *Id.* at *5.
[47] *Id.*

Delaware choice of law provisions and five other agreements contained New York choice of law agreements.[48] The Court of Chancery ruled that it would

> … apply Delaware law to all claims and affirmative defenses concerning or incident to the three Agreements containing Delaware choice of law provisions and will apply New York law to all claims and affirmative defenses concerning or incident to the five Agreements containing New York choice of law provisions.[49]

Importantly, the Court of Chancery noted that its "approach ends up being an academic exercise because no issue has been presented where the analysis and results would differ in any material respect under either state's law."[50] Accordingly, the Court of Chancery did not delineate which law applied to the claims and affirmative defenses, and considered both New York law and Delaware law.

Delaware "allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest."[51] Delaware and Alabama each have a substantial relationship to the parties and the transaction. GEA is incorporated in Delaware[52] and three of the four documents comprising the Contract dictate Delaware law should govern.[53] Under the parties' Contract, GEA agreed to deliver, install, and service the Freezers in Golden State's Opelika, Alabama facility.[54] Contrary

---

[48] *Standard Gen.*, 2017 WL 6498063, at *8.

[49] *Id*. at *10

[50] *Id*. at *10 n.83.

[51] *Abry Partners V, L.P. v. F & W Acquisition, LLC*, 891 A.2d 1032, 1047 (Del. Ch. 2006) ("In turn, § 187 allows the law of the state chosen by the parties to govern contractual rights and duties unless the chosen state lacks a substantial relationship to the parties or transaction or applying the law of the chosen state will offend a fundamental policy of a state with a material greater interest.").

[52] *Edelist v. MBNA Am. Bank*, 790 A.2d 1249, 1256 (Del. Super. Aug. 9, 2001).

[53] *See* Counterclaims, Ex. 1, AIA Agreement § A.13.1.1 ("the Design-Build Contract shall be governed by the law of the place where the Project is located."); Ex. 1, MSSA § 11 ("[a]ll disputes involving the subject matter of this MSSA, except actions arising under the patent and copyright provisions of the U.S. Code, shall be determined under the law of the State of Delaware without regard to its conflict of law provisions."); Ex. 1, GEA Standard Freezer Conditions of Sale § 1 ("[p]roposals and/or resulting contracts shall be interpreted solely under the laws of the state of Delaware, USA ….").

[54] Counterclaims at ¶ 12, Ex. 1.

to Golden State's arguments, the record before this Court does not show that the application of Delaware law would offend a fundamental policy of Alabama. There does not appear to be a conflict between Alabama and Delaware state law as to whether Golden State has stated claims for relief in Counts II–VIII and X–XI. Indeed, Golden State does not allege that there is a conflict. The Court therefore does not need to conduct a conflict of law analysis of the contractual claims.

The next step is to analyze whether the language in the Contract is sufficiently broad to cover Golden States' tort claims. Delaware courts "emphasizing the need for certainty in contractual rights and relations" have rejected the argument that "different states' laws should be applied to claims sounding in tort and contractual claims."[55] In *Abry Partners V, L.P. v. F & W Acquisition, LLC*, the Court of Chancery explained:

> Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.
>
> .... To layer the tort law of one state on the contract law of another state compounds that complexity and makes the outcome of disputes less predictable, the type of eventuality that a sound commercial law should not seek to promote.[56]

In *Standard General*, all the agreements either had language that the choice of law covers "all" disputes relating to the agreements or have an express choice of law provision accompanied by a consent to jurisdiction in the same forum as the chosen law.[57] The Court of Chancery found that this language reflected an intention to have the chosen law govern the contractual claims as

---

[55] *Millett v. Truelink, Inc.*, 2006 WL 2583100, at *3 (D. Del. Sept. 7, 2006) (citing *Abry Partners*, 891 A.2d at1047.
[56] 891 A.2d at 1048.
[57] *Standard Gen.*, 2017 WL 6498063, at *9.

well as the tort claims incident to those claims.[58]  Similarly, the MSSA has language that covers "[a]ll disputes involving the subject matter of this MSSA," demonstrating an intention for the chosen law to govern tort claims.[59]  Although the other choice of law provisions in the Contract do not contain similar broad language, the tort claims still will not be treated differently because such treatment "would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid."[60]  As stated above, Delaware and Alabama law do not appear to conflict as applied to Golden State's tort claims.  The Court therefore finds it unnecessary to conduct a choice of law analysis and will consider both Delaware and Alabama law in analyzing the contract and tort claims.

### B. THE COURT LACKS SUBJECT MATTER JURISDICTION OVER THE NEGLIGENT MISREPRESENTATION CLAIM.

Jurisdiction over the subject matter of the case is an indispensable element of any judicial proceeding, and thus, "a threshold inquiry must be made to determine whether a Court has proper jurisdiction over the claim before it."[61]  The Court may raise the issue of subject matter jurisdiction *sua sponte*.[62]  "Whenever a question of subject matter jurisdiction is brought to the attention of the trial court, the issue must be decided before any further action is taken, and the issue of jurisdiction must be disposed of regardless of the form of motion."[63]

---

[58] *Id.*
[59] Counterclaims, Ex. 1, at 60, MSSA § 11.
[60] *Abry Partners*, 891 A.2d at 1048.
[61] *Texcel v. Commercial Fiberglass*, 1987 WL 19717, at *2 (Del. Super. Nov. 3, 1987).
[62] *Boyce Thompson Inst. v. MedImmune, Inc.*, 2009 WL 1482237, at *10 (Del. Super. May 19, 2009) (citing Del. Super. Civ. R. 12(h)(3) ("Whenever it appears by suggestion of the parties or otherwise that the Court lacks jurisdiction of the subject matter, the Court shall dismiss the action.")).
[63] *Texcel*, 1987 WL 19717, at *2.

It is well-settled that the Court of Chancery has exclusive jurisdiction over claims of negligent misrepresentation.[64] Accordingly, Golden State's negligent misrepresentation claim is dismissed.

### C. THE ECONOMIC LOSS DOCTRINE DOES NOT BAR GOLDEN STATE'S NEGLIGENCE AND GROSS NEGLIGENCE CLAIMS BUT DOES BAR THE FRAUDULENT INDUCEMENT AND INTENTIONAL MISREPRESENTATION CLAIMS.

The economic loss doctrine is a judicially created doctrine that prohibits certain claims in tort where overlapping claims based in contract adequately address the injury alleged.[65] "The driving principle for the rule is the notion that contract law provides a better and more specific remedy than tort law."[66] Fraud claims are not always prohibited by the economic loss doctrine.[67] However, "in order for contract and tort claims to co-exist in an action, the [counterclaim plaintiff] must allege that the [counterclaim defendant] breached a duty that is independent of the duties imposed by the contract."[68] Allegations of fraud that go directly to the inducement of the contract, rather than its performance, would present a viable claim."[69] Fraud is a recognized exception to the economic loss doctrine, but only if "the fraud claim relates to the inducement of the contractual relationship, and not performance under the contract...."[70]

#### i. Negligence and Gross Negligence

The economic loss doctrine does not bar Golden State's negligence or gross negligence counterclaims because Golden State has pled damages unique from its contract claims. The

---

[64] *See Van Lake v. Sorin CRM USA, Inc.*, 2013 WL 1087583, at * 11 (Del. Super. Feb. 15, 2013).

[65] *Abbott Labs. v. Owens*, 2014 WL 8407613, at *7 (Del. Super. Sept. 15, 2014); *Brasby v. Morris*, 2007 WL 949485, at *6 (Del. Super. Mar. 29, 2007); *Danforth v. Acorn Structures*, Inc., 608 A.2d 1194, 1195 (Del. 1992).

[66] *Brasby*, 2007 WL 949485, at *6.

[67] *Abbott Labs.*, 2014 WL 8407613, at *7.

[68] *Id*; *see also McKenna v. Terminex Int'l Co.,* 2006 WL 1229674, at *2 (Del. Super. Mar. 13, 2006).

[69] *Brasby*, 2007 WL 949485, at *7.

[70] *Kuhn Const. Co. v. Ocean & Coastal Consultants, Inc.*, 844 F.Supp.2d 519, 529 (D. Del. 2012); *see also Commonwealth Const. Co. v. Endecon, Inc.*, 2009 WL 609426, at *4 (Del. Super. Mar. 9, 2009) (discussing the "interplay between the economic loss doctrine and intentional torts.").

economic loss doctrine prohibits recovery in tort where a product damages only itself, that is, "it has not caused personal injury or damage to *other property*, and the only losses suffered are economic in nature. Economic loss is defined as monetary loss, costs of repair or replacement, loss of employment, loss of business or employment opportunities, loss of good will and diminution in value."[71] "The threshold issue for determining whether the economic loss doctrine applies is whether the [counterclaim defendant] breached a duty independent of its contractual obligations."[72]

Golden State is aiming to recover damages to property other than the defective Freezers. Specifically, Golden State alleges damages resulting from the loss of thousands of Golden State's hamburger patties and damage to the Opelika, Alabama facility premises resulting from the defective Freezers.[73] Golden State has adequately alleged that GEA breached an independent duty to provide functioning Freezers "in such a manner so as not to cause reasonably foreseeable harm."[74]

### ii. Fraudulent Inducement

In the fraudulent inducement counterclaim, Golden State asserts that GEA induced Golden State to enter into the Contract by representing to Golden State that the Freezers were capable of a throughput of 15,000 pounds of hamburger patties per hour for a full 17-hour production shift, which Golden State required to run its Opelika facility. GEA produced several project proposals that included specifications for the Freezers. Mr. Johnston also represented that the Freezers would meet the throughput temperature and production needs that Golden State

---

[71] *Sycamore Farms, Inc. v. Barnes Elec., Inc.*, 2011 WL 5330621, at *1 (Del. Super. Oct. 20, 2011) (emphasis added).
[72] *Id*.
[73] Counterclaims ¶¶ 23, 48, 96.
[74] *Id.* ¶ 46.

15

required. Golden State claims that these representations were false and misleading and that they were designed to induce Golden State to enter into the Contract.

Generally, "the economic loss doctrine does not extend to claims of fraud where the alleged misrepresentation is independent of the contract, such as claims for fraud in the inducement."[75] This exception to claims that are independent of the parties' contract, like fraud in the inducement, is subject to a limitation widely-recognized in other Circuits and Delaware.[76] As stated by the District Court of Maine, this limitation holds that "if the tort alleged is intentional or fraudulent misrepresentation by a seller to a buyer, but the misrepresentation *only goes to the quality or quantity of the goods* promised in the contract," then the economic loss doctrine bars the claim.[77] Here, the alleged representations by GEA only go to the quality of the goods promised in the contract.

The *Alltrista Plastics, LLC v. Rockline Industries, Inc.* case cited by Golden State is not applicable here.[78] In *Alltrista*, the plaintiff agreed to develop a tool that could manufacture plastic canisters and the defendant agreed to purchase a minimum number of canisters from the plaintiff each year for three years.[79] The plaintiff then created a prototype tool that produced one

---

[75] *American Aerial Services, Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, at 111 (D. Me. 2014) (citing *Marvin Lumber and Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 885 (8th Cir. 2000)).

[76] *Danforth v. Acorn Structures, Inc.*, 608 A.2d 1194, 1196 (Del. 1992) ("Where damages are sought, regardless of the absence or presence of privity, due to qualitative deterioration of a product, that is, not damaged by explosion, accident or other calamity, and the product has damaged only itself, recovery may not be had in tort."). Under Delaware tort law, the economic loss doctrine completely bars recovery of economic loss caused by qualitatively defective products. *See also Council of Dorset Condo. Apartments v. Dorset Apartments*, 1992 WL 240444, at *2 (Del. Super. Aug. 26, 1992); *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014); *Lake & Piepkow Farms v. Purina Mills, Inc.*, 955 F. Supp. 791, 794 (W.D. Mich. 1997); *Air Prod. & Chemicals, Inc. v. Eaton Metal Prod. Co.*, 256 F. Supp. 2d 329, 337 (E.D. Pa. 2003) ("In reaching this conclusion, the court implied that the underlying rationale for the economic loss doctrine, that parties have a remedy in contract for misrepresentations regarding the subject matter of the contract, does not apply to fraud in the inducement claims that relate to matters other than the quality or character of the goods sold.").

[77] *Am. Aerial Servs., Inc. v. Terex USA, LLC*, 39 F. Supp. 3d 95, 111 (D. Me. 2014) (citations omitted) (emphasis added).

[78] 2013 WL 5210255, at *1 (Del. Super. Sept. 4, 2013).

[79] *Alltrista Plastics*, 2013 WL 5210255, at *1.

16

canister at a time ("the single-cavity tool") to demonstrate to the defendant its ability to successfully manufacture a canister that would meet the defendant's requirements.[80] The defendant subjected the canisters produced from the prototype to its validation tests in order to determine if the canisters met their specified criteria. Based on its evaluation of the canisters, the plaintiff approved of the canisters produced from the single-cavity tool and also authorized the defendant to manufacture a tool that could produce eight canisters at a time ("the eight-cavity tool").[81] According to the defendant, the plaintiff told the defendant that the canisters produced from the single-cavity tool were representative of the canisters that ultimately would be produced from the final eight-cavity tool.[82] The plaintiff then manufactured plastic canisters produced from the eight-cavity tool and delivered them to the defendant, who subjected the canisters to its validation tests.[83] According to the defendant, the canisters produced from the eight-cavity tool did not meet its requirements and were different from the canisters produced from the prototype.[84]

In the defendant's counterclaim, the defendant alleged that the plaintiff's "representations about its *ability* to manufacture canisters that met Rockline's requirements were false."[85] The Superior Court found that "representing one's ability to manufacture a canister that will meet the needs of another party is a statement of fact, which, if false, can give rise to an intentional misrepresentation claim."[86] As California courts have aptly stated, although fraud generally cannot be based upon the mere failure to perform a promise, an exception exists if "the promise

---

[80] *Id.*
[81] *Id.* at *2.
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.* at *4.
[86] *Id.*; *see also Uppal v. Waters*, 2016 WL 4211774, at *4 (Del. Super. Aug. 9, 2016) (finding that the defendants' misrepresentation of their qualifications before Mr. Uppal signed the Contract did not arise under the contract).

is accompanied with statements of existing facts which show the ability of the promisor to perform his promise, and without which the promise would not be accepted or acted upon, such statements are denominated representations, and, if falsely made, are grounds of avoiding the contract, though the thing promised to be done lies wholly in the future."[87]

The promise in *Alltrista* was accompanied by false statements of existing *fact* which showed promisor's ability to perform the promise. Specifically, the accompanying statement of existing fact was that the prototype tool and the cannisters produced by the tool were demonstrative of the plaintiff's ability to produce the cannisters under the contract. Such a statement is one of present-tense fact, not just an assessment of one's future ability to perform various terms of a contract. The statement was a false assertion of existing fact, rather than a nonactionable opinion regarding the party's future actions.

Unlike the defendant in *Alltrista*, Golden State has not pled false statements of existing facts accompanying the promise that the Freezers would meet the specifications. The Freezers had yet to be created at the time of agreement. The promise regarding GEA's ability to produce Freezers that meet these specifications in the future is not sufficient to transform this breach of contract claim into a fraudulent inducement claim. Rather, all of the false statements alleged are opinions regarding future actions and the quality of the product.

Similarly, in *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, the Court found there could be separate claims for breach of contract and fraud in the context of sales of goods, although ultimately dismissing the claims for the lack of distinguishable damages.[88] The Court noted in its ruling that the defendant had provided plaintiff with sales demonstrations of plaintiff's

---

[87] *California Credit & Collection Corp. v. Goodin*, 76 Cal. App. 785, 796, 246 P. 121, 125 (Cal. Ct. App. 1926) (citing *Russ Lumber & Mill Co. v. Muscupiabe L. & W. Co.*, 52 P. 995, 998, 120 Cal. 521, 529, 530 (65 Am. St. Rep. 186)); *Wilson v. Rigali & Veselich*, 138 Cal. App. 760, 764, 33 P.2d 455, 457 (Cal. Ct. App. 1934).
[88] *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *1 (Del. Super. Mar. 13, 2017).

18

proposed POS system.[89]  The accompanying sales demonstrations were false accompanying representations of existing facts that went directly to the ability of the defendant to create the plaintiff's proposed product.  Golden State has failed to provide similar facts.  Thus, the economic loss doctrine bars the fraudulent inducement claims.

### iii. Intentional Misrepresentation

Similarly, the economic loss doctrine also bars Golden State's intentional misrepresentation counterclaim.[90]  GEA had a pre-existing duty under the Contract to timely repair the Freezers.  GEA's continued assurances that it would repair the defective Freezers are mere promises rather than misrepresentations of fact.  Specifically, Golden State alleges that: (i) GEA's continued assurances lulled Golden State into a false sense of security;[91] (ii) GEA knew or should have known that its Freezers could not meet Golden State's operating demands;[92] (iii) GEA promised Golden State that it would send qualified engineers to fix the defects;[93]  and (iv) GEA unreasonably delayed this process for months, hoping that Golden State would continue making progress payments.[94]  These allegations do not point to any misrepresentation of existing fact.  Furthermore, if a complaint alleges that "the parties had a contract and [the defendant] intended not to follow through with its obligations under the [contract] and nothing more," then a "fraud claim would be an impermissible bootstrap of [the] breach of contract claim."  Thus, Golden State's counterclaim for intentional misrepresentation is dismissed.

---

[89] *Id*.

[90] *See Brasby*, 2007 WL 949485, at *7 (finding that fraud claims are not barred by the economic loss doctrine if the claims at issue arise independently of the underlying contract).

[91] Counterclaims ¶ 65.

[92] *Id*.

[93] *Id*. ¶ 66.

[94] *Id*. ¶ 65.

## D. GOLDEN STATE PLEADS SUFFICIENT FACTS FOR ITS NEGLIGENCE CLAIM.

Under Superior Court Civil Rule 9(b), a plaintiff must plead negligence with particularity.[95] "The purpose of [Rule 9(b)] is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated."[96] To plead negligence with the particularity required by Rule 9(b), a plaintiff must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[97] "However, [m]alice, intent knowledge, and other condition of mind of a person may be averred generally."[98]

Golden State has alleged sufficient facts in its Counterclaims to put GEA on notice of which duty was implicated and how GEA failed to discharge that duty.[99] Golden State alleged damages unique to its negligence claim, including loss of tangible products and property other than the defective Freezers.[100] Golden State alleges: (i) "[u]pon installation, the Freezers immediately demonstrated repeated failures;"[101] (ii) "[w]ithin a few months, Golden State discovered unworkable defects in the Freezers and immediately alerted GEA to fix the Freezers' malfunctions;"[102] (iii) "[t]he motor and gearboxes on the Freezers persistently failed and became inoperative for long durations of the 17- hour production shift (the industry standard);"[103] (iv) "GEA installed motors and gearboxes that were designed for different mounting configurations

---

[95] Del. Super. Civ. R. 9(b).
[96] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[97] *TrueBlue, Inc., v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012)).
[98] *ITW Glob. Investments Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *5 (Del. Super. June 24, 2015).
[99] Counterclaims ¶¶ 46-47.
[100] *Id*. ¶¶ 23, 48, 96.
[101] *Id*. ¶ 16.
[102] *Id*. ¶¶ 16-18.
[103] *Id*. ¶ 17.

20

than were being used;"[104] (v) "[t]he coils in the freezers had no frost abatement system and caused large amounts of ice to build up, thereby preventing free flow of air across coils and automatic shutdown;"[105] (vi) "[y]et, GEA delayed an unreasonably long time (from August 2017 through at least the middle of March 2018) in finding solutions to repair the Freezers in the hope of collecting all of the progress payments from Golden State;"[106] (vii) "GEA falsely assured Golden State that it could bring the Freezers up to the required specifications all while concealing the true fact that this could not be accomplished;"[107] and (viii) "[a]s a result, hamburger patties were "flying around like popcorn," and Golden State sustained substantial harm, loss of product, and damages arising from destruction of its tangible property."[108] These allegations sufficiently apprise GEA of the negligence counterclaim made against it.

### E. GOLDEN STATE FAILS TO SHOW AN EXTREME DEPARTURE FROM THE STANDARD OF CARE FOR ITS GROSS NEGLIGENCE CLAIM AND THE PUNITIVE DAMAGES REQUEST IS DISMISSED.

Golden State sets forth in its gross negligence claim the same allegations as the negligence claim and argue that these allegations "taken as a whole provide facts supporting a claim of extreme departure from the standard of care sufficient to sustain Golden State's cause of action for gross negligence."[109] Under Superior Court Rule of Civil Procedure 9(b), a plaintiff must "state the circumstances involving all allegations of fraud, negligence, mistake or condition of mind with particularity."[110] The purpose of particularity is to alert the defendant of potential liability. It is not sufficient merely to make a "general statement of facts which admits almost

---

[104] *Id.*
[105] *Id.*
[106] *Id.*
[107] *Id.* ¶¶ 65, 67.
[108] *Id.* ¶¶ 18, 23.
[109] Golden State Foods Corp.'s Ans. Br. in Opp. to GEA Systems North America LLC's Mot. for Partial Dismissal of Counterclaims at 21–22.
[110] Del. Super. Civ. R. 9(b).

any proof to sustain it."[111] A recitation of conclusory allegations is not sufficient to meet the particularity requirement where the plaintiff has not provided any facts supporting a claim of extreme departure from the standard of care.[112]

Gross negligence "requires a showing of negligence that is a 'higher level' of negligence representing extreme departure from the ordinary standard of care."[113] Gross negligence exists when a "person fails to perceive a risk ... of such a nature and degree that failure to perceive it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation."[114] Gross negligence signifies more than ordinary inadvertence or inattention.[115]

In order to avoid dismissal under Rule 12(b)(6), Golden State must plead gross negligence with sufficient particularity.[116] "Generally, the issue of whether facts and circumstances amount to willful conduct or gross negligence is a fact question for the jury."[117] It may become a matter of law when the "conduct in question falls short of gross negligence, the case is entirely free from doubt, and no reasonable jury could find gross negligence."[118]

Here, the gross negligence counterclaim fails as a matter of law. In support of the gross negligence counterclaim, Golden State only added descriptive terms to the language of the original simple negligence claim. Golden State has not pleaded facts that demonstrate GEA's acts were an extreme departure from the standard of care. In claiming gross negligence, Golden

---

[111] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[112] *Brown v. Robb*, 583 A.2d 949, 953 (Del.1990).
[113] *Hughes ex rel. Hughes v. Christina Sch. Dist.*, 2008 WL 73710, at *4 (Del. Super. Jan. 7, 2008), *aff'd sub nom. Hughes ex rel. Hughes v. Christiana Sch. Dist.*, 950 A.2d 659 (Del. 2008).
[114] 11 Del. C. § 231(a).
[115] *Jardel Co. v. Hughes*, 523 A.2d 518, 530 (Del. 1987).
[116] *Smith v. Silver Lake Elementary Sch.*, 2012 WL 2393722, at *2 (Del. Super. June 25, 2012).
[117] *Midland Red Oak Realty, Inc. v. Friedman, Billings & Ramsey & Co., Inc.*, 2005 WL 445710, at *4 (Del. Super. Feb. 23, 2005).
[118] *Id.* (citing *Albright v. Abington Mem'l Hosp.*, 696 A.2d 1159, 1165 (Pa. 1997)).

22

State "did nothing more than re-package the negligence claim with gross negligence language."[119] Without providing the required particularity to provide an inference that GEA's acts were an extreme departure from the standard of care, Golden State's claim of gross negligence must be dismissed pursuant to Rule 12(b)(6). Furthermore, because Golden State has failed to state claims for fraud or gross negligence, the punitive damages claim is dismissed.

## F. THE PARTIES' EXPRESS CONTRACT BARS GOLDEN STATE'S UNJUST ENRICHMENT CLAIM.

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience."[120] The elements of unjust enrichment are: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law."[121] "It is a well-settled principle of Delaware law that a party cannot recover under a theory of unjust enrichment if a contract governs the relationship between the contesting parties that gives rise to the unjust enrichment claim."[122] This Court has held that "a claim for unjust enrichment cannot stand if the parties' relationship and the claims asserted are the subject of an express contract because the terms of that contract control and there is no occasion to pursue the theory of *quantum meruit* or contract implied in law."[123]

The Court finds no independent basis for an unjust enrichment claim arising out of the conferred benefit of contract payments. This case revolves around a contractual arrangement.

[119] *Id.*
[120] *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (quoting *Fleer Corp. v. Topp Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).
[121] *Vichi v. Koninklijke Philips Elecs. N.V.*, 62 A.3d 26, 58–59 (Del. Ch.2012).
[122] *Id.*
[123] *TrueBlue, Inc.*, 2015 WL 5968726, at *5 (internal quotations omitted).

Golden State argues that the fact that the AIA Agreement is unsigned calls into question the enforceability of the Contract. It does not follow that because one of the documents that comprise the Contract is unsigned, enforceability of the entire Contract between the parties is at issue. As such, Golden State does not plead a scenario where GEA was unjustly enriched. Golden State should be able to be made whole through a breach of contract claim if Golden State can factually demonstrate a breach of the Supply Agreement, or other related agreement.

### G. GOLDEN STATE DOES NOT STATE A CLAIM FOR INDEMNIFICATION.

GEA argues that Golden State has failed to allege damages with sufficient particularity.[124] GEA's alleged indemnification obligation covers only damages caused by GEA's negligence. The type of damages covered under the indemnification provision of the AIA Agreement includes damages "attributable to bodily injury, sickness, disease or death or to physical injury to or destruction of tangible property other than the Work itself…."[125] The type of damages covered under the indemnification provision of the GEA Standard Freezer Conditions of Sale includes losses "because of any personal injury, death or property damages to the extent cause by the sole negligence…."[126] The GEA Standard Freezer Conditions of Sale provides:

> IN NO EVENT SHALL SELLER . . . BE LIABLE IN CONTRACT OR IN TORT OR UNDER ANY OTHER LEGAL CONTEXT OR THEORY INCLUDING NEGLIGENCE AND STRICT LIABILITY, FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, INDIRECT, INCIDENTAL OR CONSEQUENTIAL DAMAGES OF ANY KIND OR CHARACTER, INCLUDING . . . DAMAGE TO OR LOSS OF PRODUCT ….[127]

---

[124] *See* Del. Super. Ct. Civ. R. 9(b).
[125] Counterclaims ¶ 95 & Ex. 1, AIA Agreement § A.3.17.1; *see also* Counterclaims ¶¶ 12, 26, 95-97.
[126] Counterclaims, Ex. 1, GEA Standard Freezer Conditions of Sale § 4(b).
[127] Counterclaims, Ex. 1, GEA Standard Freezer Conditions of Sale § 11(B)).

24

In its Response, Golden State argues that its Counterclaim adequately alleges it incurred "significant pecuniary harm, substantial product loss, increased operational costs, and property damage" due to GEA's negligence, including the destruction of "thousands of Golden State's hamburger patties" as a result of the defective Freezers. [128] However, "pecuniary harm" and "increased operational costs" are not within the scope of the cited indemnification provisions. Furthermore, the parties have explicitly excluded liability for "damage to or loss of product." Lastly, Golden State has not pleaded covered property damages with the requisite particularity required under Superior Court Rule of Civil Procedure 9(b).[129] The purpose of Rule 9(b) is to allow GEA to be "sufficiently informed of the charges made so as to be able to prepare a defense to them."[130]

The Court cannot discern from the Counterclaims what covered property damage actually occurred, or how it occurred. Under the circumstances, however, the Court will grant Golden State leave to file an amended counterclaim within fifteen (15) days to plead damages with more specificity.

## VI.    CONCLUSION

For the reasons set forth above, the Court **DENIES IN PART AND GRANTS IN PART** the Motion. The Court holds that (i) the Motion is denied on the negligence counterclaim (Count IV) because the counterclaim is sufficiently plead; (ii) the gross negligence counterclaim is dismissed because Golden State fails to show an extreme departure from the standard of care; (iii) the fraudulent inducement counterclaim (Count VI) and intentional misrepresentation counterclaim (Count VII) are barred under the economic loss doctrine; (iv) the negligent

---

[128] Counterclaims ¶¶ 96, 101.
[129] Super. Ct. Civ. R. 9(b).
[130] *Myer v. Dyer*, 542 A.2d 802, 805 (Del. Super. Ct. 1987).

25

misrepresentation counterclaim (Count VIII) is dismissed for lack of subject matter jurisdiction; (v) the unjust enrichment counterclaim (Count X) is dismissed because the counterclaim asserted is the subject of an express contract; (vi) the indemnification counterclaim (Count XI) is dismissed, with leave to amend within fifteen (15) days, because it fails to plead damages with sufficient particularity; and (vii) the request for punitive damages in the prayer for relief is dismissed because the Counterclaims fail to state causes of action for fraud or gross negligence.

Dated: June 8, 2020
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

26